2011 UT App 152

WASATCH OIL & GAS, LLC,
Plaintiff and Appellee,

v.

EDWARD A. REOTT; Key Energy Services, Inc.; J–West Oilfield Services, Inc.; and Mission Energy, LLC, Defendant and Appellant.

Goal, LLC; and Regoal, Inc., Counterclaim, Third-party and Crossclaim Plaintiffs, and Appellants,

v.

Wasatch Oil & Gas, LLC; Mission Energy, LLC; Wasatch Oil & Gas Production Corporation; Wasatch Gas Gathering, LLC; and Bill Barrett Corporation, Counterclaim, Third-party and Crossclaim Defendants, and Appellees.

No. 20090749–CA.

Court of Appeals of Utah.

May 12, 2011.

Rehearing Denied Nov. 28, 2011.

J. Craig Smith, D. Scott Crook, and Bryan C. Bryner, Salt Lake City, for Appellants.

Eric C. Olson and Matthew K. Richards, Salt Lake City; Nick Sampinos, Price; and Carolyn L. McIntosh and Donna Vetrano Pryor, Denver, Colorado, for Appellees.

Before Judges DAVIS, ORME, and VOROS.

## MEMORANDUM DECISION

DAVIS, Presiding Judge:

¶ 1 Edward A. Reott; Goal, LLC; and Regoal, Inc. (collectively, Reott) appeal from the trial court's judgment quieting title to certain properties in Wasatch Oil & Gas, LLC; Wasatch Gas Gathering, LLC; Wasatch Oil & Gas Production Corporation; and Bill Barrett Corporation (collectively, Wasatch). Reott also appeals from the trial court's order denying his request for an award of damages. We affirm.

### I. Oral Authorization

¶ 2 Reott argues that the June 2000 transfer from Mission Energy, LLC (Mission) to Wasatch was not effective because Mission did not orally authorize the transfer of the Section 32 leases. Reott makes three arguments, each in the alternative: (1) that Colorado law should have been applied here; (2) that even if Utah law applies, the oral authorization exception to the statute of frauds is no longer good law; and (3) that even if Utah law does still provide for an oral authorization exception, the trial court's factual findings do not support the application of the exception. Each of these issues is a question of law, which we review for correctness. First, "the question of which state's law should apply to a case or to a particular issue is a question of law, and we ... accord no deference to the trial court's conclusion." *Records v. Briggs,* 887 P.2d 864, 867 (Utah Ct.App.1994). Second, "it is our role as an appellate court to define what the law is, and we never defer to any degree to a trial court on that count." *State v. Pena,* 869 P.2d 932, 937 (Utah 1994). Third, "[w]hether the district court made the necessary factual findings to support its determination is a ques-

tion of law that we review for correctness." *Robinson v. Robinson,* 2010 UT App 96, ¶ 7, 232 P.3d 1081, *cert. denied,* 241 P.3d 771 (Utah 2010).

¶ 3 Reott correctly asserts that because Mission was organized under the laws of Colorado, those laws should govern Mission's "organization and internal affairs." *See* Utah Code Ann. § 48–2c–1601(1) (2010) ("The laws of the state or other jurisdiction under which a foreign company is organized govern its organization and internal affairs and the liability of its managers, members, and assignees of members."); *see also Atherton v. FDIC,* 519 U.S. 213, 224, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997) ("States normally look to the State of a business' incorporation for the law that provides the relevant corporate governance general standard of care."). But the issue of whether there is an oral exception to the statute of frauds is not an issue of corporate organization or internal affairs. *See generally Atherton,* 519 U.S. at 224, 117 S.Ct. 666 (defining internal affairs as "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders" (internal quotation marks omitted)). Thus, we apply Utah law to the oral authorization question.

¶ 4 We are not convinced, despite Reott's assertion, that the oral authorization exception to the statute of frauds is no longer recognized in Utah. The statute of frauds provides,

> No estate or interest in real property, other than leases for a term not exceeding one year, ... shall be created, granted, assigned, surrendered or declared otherwise than by act or operation of law, or by deed or conveyance in writing subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by his lawful agent thereunto authorized by writing.

Utah Code Ann. § 25–5–1 (2007). "Naturally, that section is applicable to agents of corporations, but the courts in interpreting similar provisions have adopted an exception when the person who acts under an oral authorization is either a general agent or

executive officer of the corporation." *Mathis v. Madsen*, 1 Utah 2d 46, 261 P.2d 952, 956 (1953). The reasoning behind this exception is that "[t]he executive officer of a corporation is something more than an agent. He is the representative of the corporation itself." *Id.* (internal quotation marks omitted). And although Reott cites to several cases that do not recognize the oral authority exception, none of these cases involve a situation in which the exception could possibly apply, that is, where the actor was acting on behalf of a corporation. *See Williams v. Singleton*, 723 P.2d 421, 423 (Utah 1986) (per curiam) (husband acting under his wife's oral authorization); *Cady v. Johnson*, 671 P.2d 149, 150 (Utah 1983) (son apparently acting under his mother's oral authorization); *Frandsen v. Gerstner*, 26 Utah 2d 180, 487 P.2d 697, 698 (1971) (real estate broker acting on behalf of his clients). We therefore see nothing indicating that Utah courts have abandoned the oral authorization exception to the statute of frauds.

¶ 5 When looking at the facts found by the trial court, we are convinced that they were sufficient to support the application of the oral authorization exception under the circumstances of this case. Reott argues that the trial court determined that Fred Jager was not a manager of Mission, but we see no such unequivocal determination. Although the findings indicate that Jager may not have known that he was a manager of Mission, that Jager was not heavily involved in the management of Mission, and that Justin Sutton "acted as a sole manager" of Mission, these facts are not necessarily inconsistent with Jager actually being a manager of Mission.[1] Moreover, we do not see that an exact determination of Jager's status is necessary under the facts and circumstances of this case. We see nothing in our case law that says the oral authorization must come from a manager. The rule simply requires

that the company authorize the action. In this case, the trial court's findings make clear that everyone at all involved with Mission's management and operations was in agreement with the actions taken by Sutton. Obviously Sutton approved, and as the trial court found, "Sutton discussed both the May and June 2000 transactions with Jager, who did not at the time or subsequently express any opposition to the sale of the leases or the terms of the sale and, at all times, manifested support for the actions taken by Sutton." Considering that Sutton and Jager represented all possible managers of Mission and the majority ownership of Mission,[2] we think the trial court's findings are sufficient to support the application of the oral authorization exception to the statute of frauds in this case. We therefore affirm the trial court on this issue.

## II.  Fraudulent Transfer

¶ 6 Reott contests the trial court's determination that the June 2000 transfer was not a fraudulent conveyance under Utah Code section 25–6–6, which provides that a transfer is fraudulent when "(a) the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and (b) the debtor was insolvent at the time or became insolvent as a result of the transfer," Utah Code Ann. § 25–6–6(1) (2007). Reott specifically contests the trial court's determinations that Mission received reasonably equivalent value for the leases and that Mission was not insolvent.

These issues present mixed questions of fact and law. We review factual questions under the clearly erroneous standard and legal questions under the correctness standard. Although questions of law are reviewed for correctness, we may still grant a trial court discretion in its application of

---

1. At one point in the findings, the trial court stated that "Sutton was the sole manager of Mission" when the transactions were made. But when reading the trial court's findings as a whole, particularly the multiple references to Sutton as the sole *acting* manager of Mission, we are not convinced that this language was intended as a finding that Jager was not a manager of Mission.

2. Had more managers been elected, as contemplated by Mission's operating agreement, those managers would have ultimately been chosen by Sutton, he being the sole manager of the controlling shareholder of Mission.

the law to a given fact situation. Questions of statutory interpretation are questions of law that are reviewed for correctness and no deference is given to the trial court's determination.

*Tolle v. Fenley*, 2006 UT App 78, ¶ 11, 132 P.3d 63 (citations and internal quotation marks omitted). Because we affirm the trial court's determination that Mission was not insolvent at the time of or as a result of the transfer, we affirm on the court's ultimate determination as to fraudulent transfer.[3]

¶ 7 The Uniform Fraudulent Transfer Act provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Utah Code Ann. § 25-6-3(1) (2007). It also states that a debtor is presumed insolvent when the debtor "is generally not paying his debts as they become due." *Id.* § 25-6-3(2). The trial court determined that "Mission was not able to pay its debts as they became due" and that the evidence therefore supported a presumption of insolvency. But the trial court also determined that the presumption of insolvency was "rebutted by the undisputed testimony that the 'fair value' of all of the assets of Mission exceeded the sum of its debts as of May and June 2000." The trial court specifically pointed to the testimony of both Reott and Sutton that valued the Lavinia well "at an amount in excess of the total of all outstanding Mission liabilities." Reott argues that the evidence was insufficient to support this finding. We disagree. Sutton testified that the well had "more than significant value than the amount of debt, lien, and judgments against [Mission]," and Reott testified that the well's value "could be anywhere from $2.5 million to $5 million," which estimate is far above the $1.1 million total of Mission's debts. Reott now argues that this estimation included the 640 acres surrounding the well and an unlimited depth of the well. However, even if we agree with that interpretation of Reott's testimony,[4] such an estimation could still support a conclusion that the Lavinia well—which had the most value of the property—was worth upwards of $1.1 million. Thus, there is sufficient evidence to support the trial court's finding.

### III.   Reconsideration of Prior Ruling

¶ 8 Reott argues that the trial court should not have reconsidered its prior summary judgment ruling that Wasatch caused damage to the Lavinia well pipe system and caused the resulting oil spill. We review the issue of the trial court's reconsideration of causation for an abuse of discretion. *See IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 27, 196 P.3d 588 ("[R]econsideration of an issue before a final judgment is within the sound discretion of the district court.").

¶ 9 The Utah Rules of Civil Procedure provide that decisions of the trial court that do not adjudicate all the parties' claims

---

3. Due to our determination as to insolvency, we need not reach Reott's argument that the trial court inappropriately considered promises of a percentage of possible future drilling deals and the reinstatement and maintenance of expired leases when considering whether a reasonably equivalent value was received in exchange for the leases. *See generally* Utah Code Ann. § 25-6-4 (2007) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied. However, value does not include an unperformed promise made other than in the ordinary course of the promisor's business to furnish support to the debtor or another person."). But we note that there are aspects of this argument that would have likely made it unavailing. First, Reott does not refer us to the portion of the record wherein this legal argument was presented to the trial court. Second, although the amounts paid for the reinstatement of expired leases does not count as value

paid for the leases, those amounts paid are not entirely irrelevant because they go to the value of the expired leases. Third, the value of the leases was likely much less than the amount now alleged by Reott. Indeed, Reott assigned the leases a value of only $1.00 when bidding on them at the sheriff's sale.

4. Although Reott was asked to give a valuation in relation to all of Section 32, his answer appears to be a valuation of only the Lavinia well:

Q. Okay. Based on your understanding of what you observed while you were out at the site, do you have an opinion as to the value of the leases and the associated Lavinia—the lease associated with the Lavinia Well? . . . .
A. At the time, June of 2000, I—I have a—a belief of the value of the well.
Q. And what was that?
A. It could be anywhere from $2.5 million to $5 million.

are "subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Utah R. Civ. P. 54(b); *see also Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 40, 221 P.3d 205.

A court can consider several factors in determining the propriety of reconsidering a prior ruling. These may include, but are not limited to, when (1) the matter is presented in a "different light" or under "different circumstances;" (2) there has been a change in the governing law; (3) a party offers new evidence; (4) "manifest injustice" will result if the court does not reconsider the prior ruling; (5) a court needs to correct its own errors; or (6) an issue was inadequately briefed when first contemplated by the court.

*Trembly v. Mrs. Fields Cookies*, 884 P.2d 1306, 1311 (Utah Ct.App.1994). Reott argues that there was no reasonable basis for the trial court to overturn its prior causation determination and that no new evidence was presented regarding causation. But in its order on damages the trial court stated, "On summary judgment the court found that the oil production line had been bent as a result of [Wasatch]'s actions; however, the evidence at trial showed the oil production line had not been bent." The trial court explained, "The greater weight of the evidence establishes that the oil spill resulted from a loose connection at the oil inlet coupling between the oil pipe and tank; consequently, [Wasatch] is not responsible for any damages caused by the leak." Such a situation exhibits several of the factors mentioned above, including

that new evidence was presented, a manifest injustice would occur absent reconsideration, and the trial court needed to correct its prior error. Thus, we see no abuse of discretion in the trial court's decision to reconsider the question of causation.[5]

### IV. Calculation of Damages

¶ 10 Reott argues that the trial court used an incorrect method to calculate damages arising from his inability to access the Wasatch pipeline prior to July 2005. "Whether the district court applied the correct rule for measuring damages is a question of law that we review for correctness." *Mahana v. Onyx Acceptance Corp.*, 2004 UT 59, ¶ 25, 96 P.3d 893.

¶ 11 Reott specifically argues that the trial court erred in failing to apply a lost profits test to determine damages. However, the damages calculated by the trial court *were* the amount of profits that were lost. The trial court determined that because the amount of recoverable gas was a finite amount, and because the price of gas had significantly risen between the shut-in time period and the time when the gas was eventually sold, any profits that were lost due to the shut-in were more than made up for by the later realized, significantly greater profit.[6] That is, the trial court determined that no profits were lost. We therefore affirm on this issue.[7]

¶ 12 In sum, we determine that the trial court appropriately applied the law concerning oral authorization, and we affirm the application of the oral authorization exception

---

5. Reott generally asserts prejudice due to the trial court's reconsideration of the causation issue after the summary judgment ruling. Without a more specific claim as to how this decision resulted in prejudice, we do not address this issue further.

6. We are not persuaded by Reott's argument that later profits cannot offset lost profits. Even if the case that Reott cites were controlling authority here, the facts therein are distinguishable from the facts of our case because here there was apparently little capital investment and we know with certainty the profit that the postponed collection of gas provided. *See United Elec. Coal Cos. v. Rice*, 22 F.Supp. 221, 230 (E.D.Ill.1938) ("Where there is a large capital investment, as here, the fact that the coal remained in the

ground is not a controlling factor, particularly where there is sufficient other coal to keep the capital working over a substantial period of time.... Whether it can be mined at some future time, after plaintiff has exhausted its other coal, at a net profit that will fairly compensate plaintiff for its then required use of its capital investment and also for its losses suffered through its enforced idleness during the period in question, as shown by the evidence, takes one into the realm of pure speculation.").

7. Reott's reply brief argues that the evidence was insufficient to support the trial court's calculation of profits. However, we will not address issues raised for the first time in a party's reply brief. *See Coleman ex. rel. Schefski v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122.

to the statute of frauds under the circumstances of this case. We affirm the trial court's determination that no fraudulent transfer was shown here, specifically, that Mission rebutted the presumption that it was insolvent at the time of or as a result of the June 2000 transfer. We also affirm as to damages because we see no abuse of the trial court's discretion in its reconsideration of the causation issue and we are convinced that the trial court actually did use lost profits as the measure of damages.

¶ 13 WE CONCUR: GREGORY K. ORME and J. FREDERIC VOROS JR., Judges.